553 So.2d 898 (1989)
Charles GIBSON
v.
BOH BROTHERS CONSTRUCTION CO., INC. and ABC Insurance Company.
No. 89-CA-0554.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1989.
Robert M. Braiwick, Jr., New Orleans, for plaintiff-appellant.
David F. Bienvenu, J.B. Treuting, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, for defendant-appellee.
Before BARRY, WARD and WILLIAMS, JJ.
BARRY, Judge.
This appeal involves alleged leg and lung disabilities and the dismissal of plaintiff's claim for compensation benefits.
Charles Gibson began working for Boh Bros. Construction Co., Inc. in 1965 as an "oiler." In 1967 he became a "form setter," a job which involved knee bending. He also cleaned manholes, made "shag" (apparently a cement mixture), poured tar, set joints and graded dirt. Gibson had smoked for ten to fifteen years until about 1985.
Gibson began setting forms on a levee job at Luling around 1985. The incline of the levee required him to work on an angle.
On March 6, 1986 Gibson left work to see Dr. Stephen Tuuri because of pain and swelling in his lower right leg. Gibson never returned to work. Dr. Tuuri admitted *899 Gibson into West Jefferson Hospital because of a possible blood clot; however, a lesion was discovered on one of Gibson's lungs, and surgery by Dr. Francis Alessi removed the lesion.
Gibson filed the present suit for compensation benefits against Boh Bros. and ABC Insurance Co. (the fictitious name of Boh Bros.' compensation carrier.)[1] Judgment was rendered in favor of Boh Bros., dismissing Gibson's suit.

ENTITLEMENT TO BENEFITS
Gibson urges that the leg and lung problems entitled him to compensation benefits. At oral argument the lung claim was abandoned.
In reasons for judgment the trial court stated:
Gibson suffers from chondromalacia (arthritis) of the knee. The overwhelming weight of the evidence presented in this case establishes that Gibson's chondromalacia is a developmental disability. It is not the result of a specific on the job accident and is not an occupational disease. Rather, it is a result of the aging process and, per the testimony in this case, not traceable to Gibson's employment with Boh.
Even under the very liberal standards that this Court is obligated to and does apply to claims for workmen's compensation benefits, the plaintiff has failed to carry the burden of proof necessary to establish an enforceable claim for benefits.
Gibson testified that the levee soil would "bog" to the knee or deeper. He stated that the mud went into his boots, approximately three inches below the knee. On March 7, 1986 his leg was swollen and he had muscle pain continuously for about three weeks which worsened. He testified he left work to go to the doctor but did not ask for a "slip" because his supervisor would have argued with him. He never returned to work.
Gibson testified that when he left the hospital on March 20, 1986 he had no "wind" to walk and his legs hurt and "locked up" which prevented him from walking more than 1-2 blocks. He said this pain continued to the time of trial and now includes both knees which he has to "pat them loose" and it causes pain. He collects Social Security disability benefits, "hops" around, and watches TV. He takes Feldene and Motrin to relieve pain. He also testified that Dr. Alessi, who performed the lung surgery, told him to stay off work until he felt able to return. His present claim of disability is based on his feeling that he has too much pain.
Uel Lovell, a Boh Bros. superintendent, testified that he hired Gibson in 1967 as a laborer. He characterized Gibson as a good worker who set forms, tarred joints, ran the air gun, and did everything he was asked to do. The last thing he did for Boh Bros. was set forms on the levee job which started in October, 1985. On cross-examination he described Gibson's job as loading forms, grading with a shovel, digging, swinging a maul, and pouring tar. He mixed "shag" or grout, "pulled" concrete and had to walk through wet 8" to 10" inch thick concrete with rubber boots.
Lynn Comeaux, Jr., the Boh Bros, foreman for Gibson's crew, confirmed Gibson's job description. He testified that Gibson never told him that he was injured. On cross-examination he stated that Lovell told him that Gibson said "I'm goin' put you down," meaning he was quitting. Comeaux stated he never had a problem with Gibson who was a "damn good worker" and would re-hire Gibson.
Dr. Marc Juneau, orthopedic expert, testified that he saw Gibson on March 15, 1986 in the hospital. He noted there were no complaints of pain in the knee, though Gibson had right calf pain. His examination of the knee revealed no objective signs of distress. When he saw Gibson again on December 2, 1987 Gibson complained of pain in both knees, though worse in the right and it "gave way". Dr. Juneau noted Gibson stated the pain gradually developed while he was working on the levee. A bone scan revealed
*900 [A] focal abnormality with increased tracer localization being demonstrated at the medial aspect of the right tibia plateau and of the anterior aspect of the proximal right tibia near the anterior tibia. Skeleton structure appear otherwise symmetrical and unremarkable. No significant radiographic abnormality has been detected on plain film evaluation of 3-7-86. Mild relative increased activity is also suspected of the right patella. Tangential view of the patella is suggested for further evaluation. Correlation views of the opposite knee also might be worth considering, especially on the lateral projection. The impression is abnormal bone scan of the right knee.
Dr. Juneau noted tenderness at the joint above the knee and flexion and extension caused pain in the right knee cap. The other knee had tenderness of the "bony elements within the knee itself." Dr. Juneau found slight atrophy of the right thigh compared to the left but no significant abnormality. He felt the condition suggested some "articular changes or roughening of the surface of those bones" caused by chondromalacia (arthritis). He explained the condition is not necessarily associated with a traumatic event, but that an injury increases the chance of having chondromalacia or some other problem with the surface of that bone. When asked if continued bending of the knee would contribute to this over twenty years, he responded:
Well, you know, I think that direct activity in that way isyou can't directly relate it. We see chondromalacia in old ladies who have never done anything but normal things. They are maybe a little overweight and develop it, but we also see it from direct injury when there is a traumatic event. So it may be directly related to a traumatic event or it may be independent of a traumatic event. I'm not trying to evade your question. When we are talking about traumatic events we are talking about one direct insult like a football injury to the knee or normal wear and tear which can be microtrauma.
So, to directly answer your question, I don't know if I can say that bending your knee over twenty years causes chondromalacia whereas you would have it if you sat at a desk for twenty years, I don't know.
When asked whether he could say with a reasonable degree of medical certainty that Gibson's condition is more likely than not work related he responded
I think it is more likely that the chondromalacia is not related to his work, but the symptoms that he was having by working on uneven ground is probably related to the aggravation of walking on the uneven ground because he has chondromalacia.
* * * * * *
I think that someone who has chondromalacia and works on even surfaces, because of the pressures that they may exert on the kneecap from walking on uneven surfaces, putting pressure on the under-surfaces of the kneecap, can be biomechanically greater than walking on smooth surfaces. If someone has chondromalacia walking on uneven surfaces, it could aggravate that or make it be known to that person that the [sic] have something wrong with their knee.
Dr. Juneau also thought walking in deep mud and wet concrete could make the condition symptomatic. On cross-examination, Dr. Juneau stated the symptom should go away once the activity causing the condition to be symptomatic ceases, though pain from the condition is usually intermittent.
In Dr. Juneau's opinion, Gibson is capable of performing his previous job duties and has no functional disability. He stated that the chondromalacia generally is related to wear and tear or age. When asked again if the chondromalacia was job related, he stated
I don't know how you can say that. I can't sit here and say that walking up and down a levee for six months causes a patient to have chondromalacia, when it is an aging process. It takes time to develop. He may have had it if he were walking on flat surfaces. He may have had it if he were working at the particular *901 job. I don't think that you can say that walking up and down levees can cause Grade I or Grade II chondromalacia, when it is seen in patients who don't do this kind of work at all. So, it is not a cause and effect type of thing. It is notyou had an injury, you injured your knee, twisted the knee, had a torn cartilage, therefore you develop chondromalacia, secondary to the injury. You can't say that because it is a developmental thing, and I think that it is more likely that it is not related to a six month injury of walking up and down levees. It is likely it was there and this aggravated it. I don't think walking up and down levees six months made him have chondromalacia.
Dr. Juneau said his only advice would be for Gibson to avoid anything that hurt his knee.
All other testimony was by deposition.
Dr. Stephen Tuuri, internal medicine expert, recalled Gibson's initial visit on March 7, 1986. Dr. Tuuri noted that Gibson complained of pain during the past two weeks in his right lower extremity, predominantly in the posterior right knee, with soreness in his right calf. He hospitalized Gibson and a venogram was negative. X-rays were normal and an ultrasound was negative. A bone scan showed "abnormal uptake" over the right knee which would be compatible with an inflammatory condition. Dr. Tuuri consulted an orthopedic surgeon who recommended that Gibson be put on anti-inflammatory drugs.
A routine profile screening was performed, including a chest x-ray which revealed a mass on the right lung. On March 12, 1986 Gibson underwent lung surgery and a biopsy indicated no cancer. Gibson was discharged from the hospital on March 20, 1986.
Gibson was seen by Dr. Tuuri on March 26 and April 21. On March 26 Gibson complained of a rash over his arms and legs which Dr. Tuuri attributed to an antibiotic. The knee was not examined.
On April 21, 1986 no knee pain was noted. Dr. Tuuri testified that the only impairment Gibson had would be related to the lung surgery which had taken place a few weeks before.
Dr. Tuuri found nothing that would keep Gibson from work. He said there was no need to wear a brace or stay off the knee.
Dr. Tuuri noted Gibson was given medication for pain. When asked by Gibson's counsel if Gibson's work could cause an inflammation or derangement of the knee, Dr. Tuuri responded it was possible but both knees would be affected. Dr. Tuuri admitted he could not say whether the knee problem was work related. He said that someone working as a laborer for twenty years could exhibit some degree of degenerative wear and tear of the joints.
Dr. Alessi (who performed the lung surgery) saw Gibson three times post-operatively. He testified that healing was normal except for difficulty in his upper extremity which he felt was psychological. On the third visit Gibson complained of shortness of breath. Dr. Alessi explained that Gibson had to move, cough, and deep breathe to clear adhesions and that persistent non-activity slowed his cure time and deteriorated his overall condition.
The record indicates that Gibson aggravated a pre-existing condition by working on the levee. "Accident" within the meaning of La.R.S. 23:1031 of the Louisiana Worker's Compensation Act includes a situation such as this where the conditions of employment produce continual stress or microtrauma or exposure and events combine to aggravate a pre-existing condition. Houston v. Kaiser Aluminum and Chemical, 531 So.2d 1129 (La.App. 4th Cir. 1988). However, the record only contains Gibson's self-serving testimony to indicate he was disabled under La.R.S. 23:1221 as a result of the aggravation of the chondrolacia. All expert testimony concluded there was no disability from the leg condition.
The plaintiff's burden of proof is by a preponderance of the evidence and the trial court's finding on factual issues in compensation cases are given great weight and are not to be disturbed absent manifest error. Fraychineaud v. R-N Concrete Service, 464 So.2d 889 (La.App. 4th Cir.1985).
*902 We have no choice but to confirm the trial court's conclusion that Gibson failed to carry his burden of proving an enforceable claim under the Worker's Compensation Act.

DAMAGES FOR FRIVOLOUS APPEAL
Boh Bros. answered the appeal contending the appeal was frivolous. The appeal was not taken "solely for delay or that counsel is not sincere in the view of the law he advocates...." Parker v. Interstate Life & Accident Ins. Co., 248 La. 449, 179 So.2d 634, 636 (1965). Boh Bros.' demand for damages is rejected.
The judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Nothing in the record indicates any further action against the alleged insurer.